UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | |
|---|---|
| BRANDON STRAKA, WALKAWAY CAMPAIGN PAC and WALKAWAY FOUNDATION,<br><br>*Plaintiffs,*<br><br>-*v.*-<br><br>DAVID S. CLEMENT, @BRAWNDOSNITCHKA, @CHICHIVISION18, @MIKECLOVER7, @STONEPGH, @THATSQUITEAWALK, @HIGHENANONTOO, @TOOLEJK *and* @ZIBTARA *a/k/a* MIRANDA DEW.<br><br>*Defendants.* | Case No. 8:24-cv-00024<br><br><br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiffs Brandon Straka, Walkaway Campaign PAC and Walkaway Foundation, by and through their undersigned counsel, complain and say as follows against Defendants David S. Clement and the operators of the pseudo-anonymous social media accounts on the "X" platform, better known by its previous name of Twitter, under the usernames @BrawndoSnitchka, @ChiChiVision18, @MikeClover7, @StonePGH, @ThatsQuiteAWalk, @Highenanontoo, @Toolejk and @Zibtara, also known as Miranda Dew.

## I.   INTRODUCTION

1.     Brandon Straka lives in Omaha, Nebraska. He founded and operates the #WalkAway Campaign through the Walkaway Campaign Political Action Committee ("Walkaway PAC") and the Walkaway Foundation, a 501(c)(3) entity ("#WalkAway"). The #WalkAway Campaign is a grassroots movement that encourages and supports Americans who have identified with the political Left to "walk away" from divisive politics and extremism.  He is

1

also a conservative journalist, political commentator, activist and prominent social media influencer.

2.      Because of Mr. Straka's political influence and efficacy, Plaintiffs have been targeted by many ideological opponents who resent his success and the values he stands for.

3.      This is especially true in the case of Mr. Straka, whose narrative and organization are premised on repudiating a past association with the political movements, ideologies and behaviors that define his current adversaries.

4.      Mr. Straka welcomes the opportunity to engage such opposition on the merits, and is aware that personal slights and insults have all been part of rough-and-tumble grassroots politics.

5.      Not all his opponents, however, are satisfied with opposing Mr. Straka and his movement on the merits or even by way of heated polemic. Some have, by every indication, made it their life's work to harass him into oblivion.

6.      And for over three years, the Defendants—a gang of cyberstalkers—have engaged in a campaign of relentlessly publishing, on Twitter and via a website they created to deceptively mimic #WalkAway, a raft of false and defamatory claims about Brandon Straka in a coordinated effort to interfere with and destroy his personal and business reputation, his ability to function personally and professionally on the Internet, and his sense of personal safety and security.

7.      Defendants have targeted, and still target, Mr. Straka, along with his donors, his vendors, his social media followers and others with whom he does business, exposing them to literally daily calumny and vicious attacks that include false accusations that Mr. Straka is a violent convicted felon who has committed rape, fraud, theft, illegal drug use and embezzlement.

8.      Altogether, Defendants have tweeted about Mr. Straka well over 30,000 times and counting. Virtually every tweet contains not merely insults and pejoratives but outright lies,

2

misrepresentations and other forms of defamation. Blocking the Defendants does no good because they have found a way to exploit Twitter's terms of service and functionality by posting replies to comments from Mr. Straka's followers and supporters, as well as "tagging" Mr. Straka's account in almost every post to ensure that anyone searching for content about Mr. Straka—as well as Mr. Straka himself—will see their daily attacks on him. Defendants search Mr. Straka's name compulsively every day on Twitter, looking for stories about Mr. Straka and for unsuspecting users who are discussing Mr. Straka or his work. The inexorable nature of the posts and the astronomical volume of published falsehoods is psychologically devastating, and the effort necessitated by Mr. Straka to combat them has been financially calamitous to him as well.

9.      In a concerted effort to create reputational risk to and excommunicate Mr. Straka, Defendants follow and track every move that he makes, obsessively cyberstalking him all day long, every day, 7 days a week without ever taking a break. They even attack, often in tandem, nearly every person who tweets anything positive about Mr. Straka or his work.

10.     Mr. Straka does not engage with any Defendant on social media.

11.     Defendants' concerted publications and republications of false and defamatory claims about Mr. Straka (described in detail and verbatim below) are, on their face, intended to destroy his life, his business, his income, his name, his reputation, his personal security, his safety and his freedom.

12.     By this lawsuit, Mr. Straka seeks to recover compensation for Defendants' misconduct, as well as a permanent protective order and injunction to end Defendants' relentless stalking and harassment.

## II.  PARTIES

13.    Plaintiff Brandon Straka is a citizen of Nebraska residing in Omaha.  In addition to his activities with #WalkAway the other activities set forth above, Mr. Straka was present on the grounds of the United States Capitol on January 6, 2021, filming events outside the east wing of the Capitol. He never entered the Capitol.  Nonetheless, Mr. Straka was arrested and pled guilty to one class B misdemeanor count of disorderly conduct in violation of 40 U.S.C. § 5104(e)(2)(D).

14.    Mr. Straka was never charged with or convicted of participating in any violence, vandalism, theft, destruction of property, or "insurrection" on January 6th.  Prosecutors agreed that there was no evidence to suggest Mr. Straka committed any felonies on January 6, and, indeed, it is a matter of public record that Mr. Straka was never convicted of any felony.

15.    Plaintiff Walkaway PAC is a Political Action Committee based in Virginia.

16.    Plaintiff Walkaway Foundation is a Virginia non-profit, also based in Virginia, to which donations are deemed tax-deductible by the Internal Revenue Service pursuant to 501(c)(3) of the Internal Revenue Code.

17.    Defendant Clement is a citizen of New York residing in New York City.  He operates multiple Twitter accounts, including "DeClementia" with the handle @DaClementMusic. As of the date hereof, Clement has approximately 1,542 followers on Twitter.  Clement, who is married to and lives with the Tony Award-winning Broadway playwright Doug Wright – whose works include "Grey Gardens," "Quills," "Goodnight, Oscar" and the Broadway adaptation of Disney's "Little Mermaid" – has tweeted about Mr. Straka a staggering 15,000-plus times. To the best of his knowledge, Mr. Straka has never met or spoken with Clement or Wright.

18.    Twitter    users    @BrawndoSnitchka,    @ChiChiVision18,    @MikeClover7, @StonePGH, @ThatsQuiteAWalk, @toolejk, and @highenanontoo are pseudo-anonymous

4

Twitter accounts. The @zibtara Twitter account, upon information and belief, is operated by Miranda Dew ("Dew"). Except for Dew, with whom Mr. Straka shared a brief friendship 25 years ago, Mr. Straka does not know the identity of any of these Defendants.

19.    Defendant @BrawndoSnitchka is an account created in November 2020, which describes itself as a "parody" account, which it is not. As of the date hereof, the account has 495 followers and has tweeted over 10,000 times. Nearly every tweet is about Mr. Straka, with the author pretending at times to be Mr. Straka, while writing most tweets in the first person and using various pictures of Mr. Straka in the account profile.

20.    Defendant @ChiChiVision18 joined Twitter in November 2018. His profile declares that he is not a big fan of "grifters." He has 572 followers and has tweeted over 3,785 times about Mr. Straka.

21.    Defendant @MikeClover7, @StonePGH, @ThatsQuiteAWalk, @toolejk, and @Zibtara collectively have tweeted over 3,000 times about Mr. Straka. @StonePGH's account uses a picture of Mr. Straka in its profile along with a picture of a rat and the message "Squealing Mr. Straka."

22.    Defendant @ThatsQuiteAWalk has intentionally protected his tweets, so that only approved followers, such as Defendants, can see them, but @ThatsQuiteAWalk's involvement in the conspiracy is evident from his interactions with and involvement in the tweets, retweets and replies published by his co-conspirators. @ThatsQuiteAWalk account uses a picture of Mr. Straka for its profile and cover photos, and makes the false and defamatory claim in its profile that Mr. Straka "grooms minorities for money."

23.    Defendant @highenanontoo joined Twitter in November 2020. @toolejk joined in November of 2022. Both, like Clement, @BrawndoSnitchka, and @ChiChiVision18, posts

5

disparaging, demeaning and defaming comments about Mr. Straka almost every day and harass anybody who works with Mr. Straka or comments positively about him.

### III.   JURISDICTION AND VENUE

24.     This action arises under the Trademark Act of 1946, the Lanham Act, (15 U.S.C.A. §§ 1051 et seq.), and particularly under Sections 32, 34, 35 and 43(a) of the Act (15 U.S.C.A. §§ 1114, 1116,  1117 and  1125(a), as more fully appears in this Amended Complaint. This United States District Court has jurisdiction under Section 39 of the Lanham Act (15 U.S.C.A. § 1121) (actions arising under the Federal Trademark Act), 28 U.S.C. 1338(a) (acts of Congress relating to trademarks), and 28 U.S.C. 1338(b) (pendent unfair competition claims).

25.     This Court has supplemental jurisdiction over all state law and common law claims in the civil action pursuant to  28 U.S.C. § 1367 because the state or common law claims are so related to claims over which this court has original jurisdiction that the state law and common law claims form part of the same case or controversy under Article III of the United States Constitution.

26.     Defendants have purposely directed their activities toward and have harmed, and continue to harm, Plaintiff, who is a resident of the State of Nebraska, by which conduct Defendants are subject to the Court's specific jurisdiction under Nebraska law.

27.     Mr. Straka has personal relationships in Nebraska, and all Plaintiffs have ties and opportunities to individuals and organizations in Nebraska related to Plaintiffs' political, nonprofit, and organizational missions. Defendants are aware that Plaintiffs have such relationships, ties, and opportunities, and they sought to disrupt, harm, and interfere with the same through their tortious conduct described herein.

28.     For example, #Walkaway has supporters, donors, followers, and members in all fifty states, including Nebraska. Nebraska's #Walkaway chapter has active members, state leaders,

6

and financial donors. Defendants' tortious acts are aimed at, among other things, disrupting the #Walkaway Nebraska chapter through their efforts to ruin Plaintiffs' reputations in Nebraska.

29.     As a further example, Defendants, in particular Defendant Clement, have discussed their plans to contact Mr. Straka's probation officer in Nebraska, stating that they have sent letters to her, and detailing their efforts to contact her to falsely report Mr. Straka for violating the terms of his probation, and encouraging others to do so. Mr. Straka has no probation violations, so Defendants' conduct is obviously intended to disrupt Mr. Straka's legal status in Nebraska.

30.     Venue is proper in this Court according to Title 18 U.S.C. §§ 1391(b)(2) and (3). Defendants are aware that Mr. Straka lives in Nebraska and that all Plaintiffs conduct their affairs in Nebraska, and they therefore sought to cause harm felt in Nebraska through their tortious conduct described herein.

## IV.  ALLEGATIONS RELATING TO ALL CLAIMS

31.     In their concerted effort to destroy Mr. Straka's life, his peace of mind, his sense of personal safety, and his relationships with others – efforts that began well before January 6, 2021 – each Defendant has taken on a different role or "job."

32.     Defendant Clement's fixation with Mr. Straka began in 2018, shortly after Mr. Straka launched #WalkAway. Defendant Clement spent months harassing Mr. Straka on Facebook, before Mr. Straka blocked him, causing Defendant Clement to move to Twitter (now known as X), where his fixation with Mr. Straka only grew, and his rhetoric became increasingly more hostile and defamatory. Upon information and belief, Defendant Clement operates at least one of the anonymous accounts named in this lawsuit.

33.     Defendants Clement, @BrawndoSnitchka, @ChiChiVision18, @highenanontoo, and @toolejk have been the worst in terms of relentless daily attacks by posting in mass volume.

7

These five Defendants have all participated in compulsive posting of obsessively hateful, destructive and defamatory content about Mr. Straka, sometimes posting hundreds of times daily, around the clock, for literally years.

34.    These Defendants also actively seek out any new events or business opportunities that Mr. Straka may be associated with, then attack persons or entities involved with him by posting egregiously false and defamatory statements, accusations, and threatening comments toward and about Mr. Straka and his associates, which are further detailed below.

35.    The role of @MikeClover7 and @StonePGH is openly to organize, lead, and execute Defendants' apparent plan to obtain information about every vendor, individual, and organization Mr. Straka uses to conduct his business, and then compulsively reach out to those people or entities to tell them that Mr. Straka is using their services to organize and execute violence, crimes such as "wire fraud" and even murder.

36.    Clover and @StonePGH relentlessly contact vendors, individuals, and businesses Mr. Straka uses to tell them that Mr. Straka is a violent criminal who is responsible for harming and killing people. Defendants encourage others to join in their efforts and to contact third parties directly, an invitation which is all too often accepted.

37.    Defendants @MikeClover7 and @StonePGH also created a website  dedicated to publishing false and defamatory statements about Mr. Straka, his business and his employees utilizing the misleading and confusing domain WalkAwayPac.com.

38.    Defendants regularly direct social media users to this website and claim that the information on it is true.

39.    The role of Dew, or @Zibtara, in this campaign is to present herself as an "insider expert" into Mr. Straka's whole life: his past, his finances, his business dealings, his professional

8

qualifications, his physical and mental health, his criminal record, his family and personal relationships, and his professional relationships and more.

40.    Dew presents all her false and defamatory claims as matters of fact that she has learned by being "best friends" with Mr. Straka.

41.    In truth, Mr. Straka has not been friends with Dew for over 20 years and has had little contact with her after that.

42.    Dew repeatedly spreads vicious disinformation about Mr. Straka, stating to her 666 Twitter followers and others that Mr. Straka is a criminal, a racist, homophobic and transphobic, anti-Semitic, an abuser, a fraudster, financially insolvent, and psychologically disturbed.  Dew has even made the false and defamatory claim that Mr. Straka's business is "pro-Holocaust," and much more.

43.    Upon information and belief, Dew operates one or more alternative accounts involved in the campaign against Plaintiffs, as represented by the specific points that Dew and certain other anonymous accounts emphasize, including Mr. Straka's past career as a hair stylist and the overlap in writing style between Dew and several of the anonymous accounts.

44.    @ThatsQuiteaWalk's role in the enterprise is to operate its locked-down or private account as a virtual "meeting ground" for Defendants to contrive ideas to attack Mr. Straka and to praise each other for their latest work.

45.    Defendants also at times seem to take orders from the person or persons operating the @ThatsQuiteaWalk account.

46.    The pile-on formula used by Defendants to attack Mr. Straka has been replicated by them literally hundreds and hundreds of times, causing their false and defamatory claims to be

published and republished again to be seen by thousands and thousands on the Internet, including Mr. Straka's supporters, followers, and donors.

47.    Defendants' purposes in doing this are (i) to poison the opinion of Mr. Straka among his natural allies and supporters and (ii) to send a message to anyone connected with Mr. Straka that they will endure this same unyielding harassment and abuse from Defendants if they speak positively about Mr. Straka in a public forum or associate with Mr. Straka in a professional relationship.

48.    Each and every Defendant has tweeted false and defamatory statements repeatedly, republished each other's false and defamatory tweets, and collectively acted in various roles to have Mr. Straka banned, blacklisted, alienated, excommunicated and terminated by his vendors, financial institutions, donors and supporters, followers, and professional colleagues.

49.    The volume and timing of Defendants' tweets about Mr. Straka demonstrate that for all practical purposes, Defendants collectively post about Mr. Straka nearly every hour of every day, obsessively stalking, tracking, and pursuing Mr. Straka.

50.    Defendants maintain this volume of attack on Mr. Straka by feeding off his high visibility, large social media following and the wealth of events, achievements and other legitimate content that can be found on the Internet concerning his activities.

51.    By all indications, Defendants accomplish this by constantly searching for photographs, videos, and information to track Mr. Straka's location, personal and professional affairs, and his every move.

52.    This is not to suggest, however, that Mr. Straka's continued level of activity or even his existence online are required to fuel Defendants' obsession with him.  To the contrary, even

10

over the course of an entire year during which Mr. Straka left social media, Defendants continued their behavior daily with the same intensity.

53. In addition to the severe damage Defendants have done to Mr. Straka's life and his business, Mr. Straka has had to live with fear and extreme distress of being stalked and harassed by third-parties all day long, every day for years. This Complaint includes only a small sampling of the Defendants' false and defamatory posts.

a) *Interference With Vendors*

54. As evidenced by their communications and course of conduct, the purpose of Defendants' conspiracy is to attack all aspects of Mr. Straka's life and business from all sides, using the Internet and Twitter, with the stated goal of creating permanent reputational risk for Mr. Straka, attempting to "take down" Mr. Straka, "ban" him and #WalkAway from the Internet and social media as well as interfere with and deny Mr. Straka access to email, social media, banks, credit cards, payment processors, and crowd funding platforms.

55. One of the broad categories of business relationships targeted and largely destroyed by Defendants is Mr. Straka's relationships with the vendors of #WalkAway.

56. One of the primary mechanisms used by Defendants to accomplish their goal of alienating Mr. Straka's organization from vendors is the promulgation of their fraudulent website, WalkAwayPac.com.

57. A link to this website appears on the Twitter profile of Defendant @StonePGH, who has openly admitted that Defendants created and own the website.

58. This confusing and defamatory website, referred to by Defendants as the "#WalkAway Buster", was intended to mirror and intercept viewers and donors to https://walkawaypac.org/, the website of a hybrid PAC organized by Mr. Straka, and to publish

11

false and defamatory statements concerning Mr. Straka by persons confused by the similarity of the domain name to that of Mr. Straka's site.

59. The defamatory claims about Mr. Straka published on Defendants' WalkAwayPac.com site include the following:

- o Mr. Straka steals money from donors, which is false;

- o #WalkAway Foundation is not entitled to its non-profit status because Mr. Straka violated tax and campaign finance laws, which is false;

- o Mr. Straka was convicted of "insurrection," which is false;

- o Mr. Straka is an "accused domestic terrorist," which is false;

- o Mr. Straka has published "misogynistic and sexist Tweets," which is false;

- o Mr. Straka sells" racist apparel," presumably meaning apparel bearing racist messages or imagery, which is false;

- o Mr. Straka received and misused PPP funds, which is false;

- o Mr. Straka and #WalkAway advocate engaging in terrorism, which is false;

- o Mr. Straka and #WalkAway seek to suppress the rights of minorities to vote, which is false; and

- o #WalkAway is an "insurrectionist organization," which is false.

60. Additionally, Defendants research virtually every vendor that Mr. Straka and #WalkAway contract to do business with, contact those vendors and then repeat such defamatory claims to them directly, as well as, *inter alia*, the defamatory claims that Mr. Straka and #WalkAway are using the services or products sold by such vendors "to finance political violence" or as part of an effort to organize, fund, or plot violence, killing, or other criminal behavior such as fraud and theft, which is false.

12

61.    Besides making these claims in direct communications to vendors and potential vendors, Defendants have also published them and ones similar to them on social media.

62.    These include the false and defamatory claims tweeted by Defendant @MikeClover7 and promoted by the other Defendants that Mr. Straka was a "key organizer of the violent Stop the Steal riot that led to the attack on the Capitol on January 6th. Mr. Straka and Stop the Steal collaborated with [white supremacist Nick] Fuentes to overrun the Capitol" and that the Federal Bureau of Investigation (FBI) arrested Mr. Straka and charged him for "his attack on the Capitol" and "accuses him of instigating an attack on police officers, as well as obstructing an act of Congress, among other charges."

63.    In addition to being literally false and defamatory, Defendants' suggestion that Mr. Straka has ever even met or spoken to Nick Fuentes is also false and defamatory.

64.    The purpose of these false and defamatory claims was to effectuate a ban of Mr. Straka and #WalkAway from every prominent social media platform and to deprive them of the benefit of vendors and service providers.

65.    In one tweet, therefore, @MikeClover7 demanded to know "[w]hy are violent insurrectionists and Nick Fuentes' collaborators like Brandon Straka being platformed by @Twitter?  Especially after they used @Twitter to organize and fund riots, like the Stop the Steal insurrection on January 6th?"

66.    @MikeClover7 also falsely asserted that Mr. Straka recorded a "live stream" video of himself "as he attacked the Capitol building."

67.    Defendants also claimed, in an appeal to Twitter to ban Mr. Straka, that "even Facebook decided to stop helping Mr. Straka organize and finance political violence," a statement that is false and defamatory in every respect.

**b)**    *The Pile-on Technique in Action*

68.    Indeed, while Defendants failed to secure a ban of Mr. Straka from Twitter, their defamatory, fraudulent, unethical and immoral conduct did cause numerous vendors to stop doing business with Plaintiffs.

69.    For example, by maliciously contacting and tweeting about email vendors—critical service providers for plaintiffs Walkaway Campaign PAC and Walkaway Foundation—and falsely claiming that Mr. Straka was using their email services to organize, plan and raise funds for violent activities, Defendants deprived Plainitifs of no fewer than five established and reputable email services.

70.    Defendants achieved this, in part, by publishing tweets and sending defamatory messages to vendors such as the following:

- o "Convicted insurrectionist Brandon Straka is using @MailJet to organize and raise money for political violence via his extremist organization WalkAway," which was false.
- o "Mr. Straka and WalkAway organized the 'Stop The Steal 'campaign and riot on the Capitol that led to the deaths of 5 people during the January 6th, 2021 insurrection," which was false.
- o "If anyone would like to investigate, you can register for the insurrectionist's @SendLane mailing list via BrandonStraka.com."

71.    Defendants' pile-on technique is readily demonstrated by the manner in which they made use of the last tweet quoted above, in which Defendant @MikeClover7 "tagged," i.e., first mentioned by use of their Twitter usernames, two representatives from the Sendlane, mail service, @realjimmykim and @caitlinkhutch.

14

72.     Defendant @BrawndoSnitchka then joined the conversation, falsely stating to the SendLane representatives that "Mr. Straka has deep ties to… the Proud Boys and collaborates with both often."

73.     Mr. Straka has never collaborated with the Proud Boys and has no affiliation with them.

74.     Mr. Straka has no ties with any extremist or violent group.

75.     Mr. Straka is not an "insurrectionist."

76.     Notwithstanding the truth of the matter, on the strength of Defendants' joint efforts, the vendor's representatives promised to take immediate action on Defendants claims, and terminated their contract with Mr. Straka and his organization.

77.     Defendants then leveraged the fact that this vendor had canceled its relationship with Mr. Straka—solely as a result of their wrongful instigation—to compel the same result with the next vendor, resulting in a series of bans premised on lies created by the Defendants.

78.     Thus, after successfully getting Mr. Straka banned from a number of mainstream payment gateways, Mr. Straka began using a new, small company called AllFundIt.

79.     AllFundIt used Stripe as their payment processor.

80.     The proprietor of AllFundIt put out a post on social media to express his excitement that Mr. Straka was using their service.

81.     Defendant @StonePGH discovered the post and immediately began harassing the proprietor, sharing his post and writing, "Who is this terrorist lover?"

82.     Defendant @MikeClover7 then joined the Twitter exchange, writing:

Why is @Stripe allowing AllFundIt to raise funds for FBI-arrested insurrectionist Brandon Straka? According to AllFundIt, they use @Stripe as their payment processor. I didn't realize that violence, insurrection and felonies are conservative causes that AllFundIt wants to help finance. Surely violence and illegal activity are

against @Stripe's terms, yet here Mr. Straka is, organizing and financing far right political violence using @Stripe

83.     Defendant @StonePGH then responded, "We have to see who AllFundIt belongs to - the website was thrown together quickly."

84.     In short order, Mr. Straka was then banned by Stripe and lost his account with AllFundIt.

85.     Similarly, Defendant @MikeClover7 began contacting Mr. Straka's current payment processing company to say that Mr. Straka is using it to commit wire fraud, tweeting, "Damn, looks like @MetroPayTech is helping @BrandonMr. Straka commit wire fraud. @MetroPayTech is the payment processor Mr. Straka uses to scam his marks."

86.     Defendant @BrawndoSnitchka joined this conversation, acknowledging the Defendants' practice of unyielding harassment, saying, "We'll keep posting until Mr. Straka is forced to do the right thing."

87.     Defendant @MikeClover7 then responded to @BrawndoSnitchka by posting a picture of a dead body in a grave with the words, "Me waking up for the 945,587,238th day of posting until Mr. Straka does the right thing."

88.     The vendors openly pursued by Defendants in this manner include, but are not limited to:

- o   AllFundIt,

- o   American Express,

- o   Anedot,

- o   Classy,

- o   Constant Contact,

- o   Discover,

16

- o   Facebook,

- o   Instagram,

- o   MailChimp,

- o   Mailer Lite,

- o   MailJet,

- o   Mastercard,

- o   Patreon,

- o   PayPal,

- o   Sendlane,

- o   Stripe,

- o   Twitter.

- o   Venmo and

- o   Visa.

89.    Defendants' wrongful and unlawful conduct caused the majority of these vendors to terminate services to Mr. Straka and #WalkAway.

90.    As a result of these terminations, Plaintiffs have suffered substantial business interruption and loss of income.

**c)   *Furtherance of the Conspiracy***

91.    As would be expected, Defendants' coordinated campaign to harm and harass Mr. Straka operates not just publicly, but through private channels as well.

92.    In one conspiratorial conversation brazenly posted online by Defendant @MikeClover7, he and @StonePGH discuss their efforts against Mr. Straka, while of course tagging two of the targeted vendors, Visa and Paypal, in the public posting:

17

> **@MikeClover7**: [He] blocked me after tweeting @VISA about how Brandon Straka raises funds for political violence using their payment processing service, and continues to do so to this day.
>
> **@StonePGH**: "Straka is also using SendLane as his email server and @PayPal to funnel the money on their WIX website with the faceBook plug-in to increase their visibility."
>
> **@MikeClover7**: "I thought @PayPal dropped them? Have a link to where I can find their PayPal info?"
>
> **@StonePGH**: "I sure do.  I will DM you that info and more interesting facts"

93.    In another example, Defendants went through the financial expenditures listed by Mr. Straka's organizations, republished them online, and jointly proclaimed that  they were "chipping away those services he uses for funding his #DomesticTerrorist activities.  The link below will show the info on his expenditures thru the [#WalkAway Campaign Super] PAC.  Same vendors as the non-profit [#WalkAway Foundation].  @Anedot took 10 days to pull him."

94.    Another such tweet by @MikeClover7 states, "Having been banned from several platforms like @MailChip, @ConstantContact, @MailerLite, @Stripe, @PayPal, @Venmo, @Patreon and many others, for organizing and raising funds for political violence, Straka now relies on @MailJet to continue funding his violent extremism."

95.    In each case, Defendants not only name, but use the Twitter username of the targeted vendors in order to demonstrate to prospective future vendors that their names will be associated with "radioactive" terms on Twitter such as "political violence," "extremism" and the like, despite the lack of any factual basis for utilizing such terms in connection with Mr. Straka.

96.    Objective truth is, in fact, utterly irrelevant to Defendants, who repeatedly misrepresent to Mr. Straka's vendors that Mr. Straka was a "domestic terrorist" who had been "convicted" of the crime of insurrection.

97.    On information and belief, Defendants do not focus efforts similar to the activities described above on any other person associated with the events of January 6th besides Mr. Straka.

98.    Defendants even falsely told vendors that Mr. Straka "hires Proud Boys for his security. Money Mr. Straka raises goes directly into members of the Proud Boys 'pockets'".

99.    Defendants also repeatedly encouraged other Twitter users to contact Mr. Straka's vendors and insist they stop doing business with him.

100.    As a result of Defendants' concerted, wrongful and unlawful conduct, Plaintiffs were permanently banned by nearly every organization that the conspirators contacted.

**d)    *Targeting Supporters, Donors and Associates***

101.    In addition to Plaintiff's vendors, Defendants use their vile defamatory techniques to target their supporters, donor base and other business associates and impose a potentially harsh cost on them for supporting or associating with Plaintiffs.

102.    Defendants have contacted thousands of Mr. Straka's supporters.

103.    On a daily basis, Clement and his confederates have contacted Mr. Straka's donors and supporters falsely stating that Mr. Straka is a "confessed felon" and "convicted felon" who was using their money to "organize violence."

104.    Defendants even falsely notified Mr. Straka's supporters and followers that Mr. Straka was "hanging with a convicted pedophile on #jan6."

105.    Clement has repeated the lie that Mr. Straka is friends with pedophiles and was "hanging out" with pedophiles dozens and dozens of times to Mr. Straka's supporters.

106.    Clement also told Mr. Straka's supporters and donors the following lies via Twitter:

- o  Mr. Straka "used QAnon lies to recruit rioters" for the January 6 attacks on the United States Capitol, which is false;

- o Mr. Straka "instructed, promoted, and cheered violence" and "rushed cops" on January 6th, which is false;

- o Mr. Straka's "only source of income" was "lying to (mostly elderly) conservatives," which is false;

- o Mr. Straka "avoided prison by snitching on his friends, followers, recruits, and funders," which is false;

- o Mr. Straka used money from donors to get "plastic surgery," "cosmetic procedures" and lip filler, and to go on extravagant vacations, which is false.

107. Each Defendant actively attacks Mr. Straka with false and defamatory statements to harm his reputation and his ability to raise money and organize.

108. Defendant @Zibtara, or Dew, told one supporter that Mr. Straka "gave up other Jan 6 defendants and is currently fighting to keep that classified. Google it. I dare you. He's not one of you; he makes money off of you," which is false.

109. Dew's hatred for Mr. Straka began swiftly and immediately the moment she learned that Mr. Straka was unwilling to join her in her hatred for Donald Trump and that he had come to an understanding of how the media had deceived the public about Trump as a politician. Enraged, Dew immediately became unhinged, compulsively texting vitriolic insults at Mr. Straka and the statement, "I will save your message, though. Where you said you would have voted for Trump. I'm going to use it against you."

110. Not long after, Dew began stalking Mr. Straka on Twitter, eventually joining up with Defendants, and has been an ongoing participant in their campaign to destroy Mr. Straka's life.

111.    Besides falsely and repeatedly claiming to have been "best friends with @BrandonStraka for 20 years!," Dew falsely claimed that

- o   Mr. Straka "gave up everything" and was "staying with his parents" who are "paying his legal defense attys," none of which is true; and

- o   "His grift [i.e., the #WalkAwayMovement] has been taken over by pro-Holocaust, homophobic immigrants and he's going to prison. Happy Birthday!," which is false in every respect.

112.    The volume of Defendants' tweets, quote tweets, retweets, replies and likes related to false and defamatory statements about Mr. Straka is so great that it was impossible for Mr. Straka to keep up with the falsehoods.  Every time Mr. Straka uses Twitter, Defendants swarm the comments under his tweets with egregious lies, offensive memes and other salacious, scandalous and impertinent comments.

### e)    *Limitless Malice*

113.    Nothing is off limits to Defendants in their online campaign against Mr. Straka. For example, Mr. Straka's mother recently suffered a life-threatening stroke. While she was in the intensive care unit, Mr. Straka informed his social media supporters of his mom's condition and used the opportunity to ponder and place in perspective the true meanings of life, death and his powerful feelings at the moment. A supporter responded, "I love you and you sir changed everything! You have done so much for this movement! What can we do to help you?"

114.    Within minutes, Defendant Clement appeared, sneering at Mr. Straka's supporter, "Serious question: besides his bank balance (you elderly maga pay your tokens well), what has Brandon Straka changed? … how sick that he used his mom's stoke to complain about how he is treated."

21

115.    Clement proceeded to post a series of tweets attacking Mr. Straka as incompetent, as a person who "informs on his followers to avoid prison"—which is false—and who steals from his supporters, adding, "Are you just another of Brandon Straka's fake accounts?"

116.    A number of Defendants then posted a series of false and defamatory statements:

**@StonePGH**: "Brandon's mother had a stroke Monday night and he is so concerned that he is on a plane on Wednesday to NY to spend days with Rudy? And is now using her health issues for sympathy because he is an insurrectionist, traitor, and snitch? #BrandonStraka #Snitch #J6 #Walkaway.

"#BotoxBrandon used his own granny to e-beg and capitalized on her dying on 1/6, his #insurrectionist day. #BrandonStraka #WalkAway #J6 #Botox

"Same old ladies that want to #PrayTheGayAway thinking #BotoxBrandon would never abandon his sick mom forget that he and his whole crazy ass clan left [his] poor old grandma Maggie to rot in the nursing home for 2 years because they refused to wear a mask to see her. #Walkaway"

**@Tookejk**: "Brandon is every one of those things. He abandoned his mom's bedside to appear on a grifting radio show…Shame on Brandon."

**@BrawndoSnitchka**: "Straka's feeling better about his mom's stroke then? How long did he wait after the stroke before jetting off to NYC to hang with criminal and sex abuser Rudy Giuliani and see movies with you? Was it a full 24 hours? Did he get a nice donation spike from the stroke tweet?"

117.    These posts are typical of Defendants' efforts to generate a profound aura of reputational risk around Mr. Straka and #WalkAway by repeatedly resorted to fabricating facts, describing events that never happened and doctoring images of Mr. Straka, then sharing this harmful and defamatory content thousands of times on Twitter.

118.    For instance, Defendants found a picture on Facebook of Mr. Straka wearing a fake mustache.  In the original Facebook post, Mr. Straka stated that he "looked like a grouchy Charlie Chaplin." Unsurprisingly, considering the purile level of their discourse, Defendants downloaded and altered the photograph, removed the caption, and posted the picture on Twitter dozens and dozens of times, telling Mr. Straka's followers, donors, and supporters that Mr. Straka was a

22

"#Nazi lover", who "posed as Hitler", and that Mr. Straka "admires Hitler", "idolizes Hitler", "likes dressing up like Hitler", and an "#insurrectionist[] like @BrandonMr. Straka" "love[s] to cosplay Hitler", and the like.

119.    Leaving nothing to chance, Defendants even intentionally reached out to Mr. Straka's Jewish supporters, posting the altered photo they themselves created, and telling Mr. Straka's Jewish supporters that he has been pushing and profiting beliefs that are "rabidly anti-Semitic," which is false.

120.    Defendants have also repeatedly posted that Mr. Straka and #WalkAway are "Islamophobic", and that the organization engages in "racism, misogyny, anti-Semitism and transphobia too," which is false.

121.    Defendants also created an image of Mr. Straka made by capturing a frame of a video of Mr. Straka speaking while he momentarily pressed his thumb and pointer finger together, falsely claiming on Twitter that Mr. Straka was "flashing a white power sign" in a "very disturbing video," which is false.

122.    Defendants have also stated repeatedly, and falsely, that Mr. Straka was a "supporter" of the conspiracist group "Qanon," that Mr. Straka was a "Qanon promoter," that #WalkAway "endorses and promotes Qanon" and "endorses and promotes Qanon conspiracies," referring in one tweet to "the Qanon Qrazies who he promoted and endorsed and recruited for the violence at the Capitol"—a statement that is false in every single respect. Defendants knew the falsity of this tweet or acted with reckless disregard for the truth, considering that Mr. Straka denounced the Qanon movement in 2019 in a national media article.

123.    Notwithstanding the public record, of which Defendants are well-versed, Defendants continued to repeatedly disparage and defame Mr. Straka along these lines, with

23

Defendant @ChichiVision18 claiming on Twitter, "He uses the racist Proud Boys For security, uses the 'shithole countries 'slur, pushes the anti-Semitic QAnon conspiracy, hired a speaker who says immigrants should be gassed, takes money from Alex Jones, and is obsessively hostile toward black protestors"—all of which is false—and @BrawndoSnitchka tweeting, "WalkAway has been linked to domestic terrorism from the beginning. Always had close Proud Boys and Alex Jones ties and one of the co-directors is QAnon propagandist Tracy Beanz," all of which is false.

124.    As another method of eroding Mr. Straka's reputation, Defendants have repeatedly and falsely accused Mr. Straka of using cocaine.

125.    In fact, Mr. Straka has proudly shared with the public the fact that despite a history of addiction, he has been free from drugs and alcohol for nine years, and he actively helps others who struggle with alcoholism and addiction.

126.    Notwithstanding these well-known facts, Defendant @ChichiVision18 made the tweet reproduced below, suggesting, without any factual basis, that Mr. Straka was using cocaine:

24

25



127.    Similarly, Defendant Clement published the tweet reproduced below, which included a series of defamatory lies including the baseless claim that "his sobriety isn't what he claims it is":



**DeClementia**
@DaClementMusic

Watching Brandon Straka freak out, lie and accuse anyone of whatever he thinks will distract from the fact that he spread lies to recruit for a violent attack, bragged about it, then informed on his recruits tells me his sobriety isn't what he claims it is or anything to emulate.

3:10 PM · Jan 18, 2023 · **37** Views

128.     Defendants also found a picture of Mr. Straka from a performance in the musical *The Full Monty* in which Mr. Straka played a stripper character. In a further effort to denigrate Mr. Straka, Defendants posted the picture on Twitter consisting of the photo and the words "BrandonStraka, Stripper #Walkaway."

129.     Defendants also repeatedly attribute to Mr. Straka statements Mr. Straka never made and views Mr. Straka never held.  For example, Defendants falsely claimed that Mr. Straka "called for civil war" in a tweet and that he had "urged violence against cops." He did not.

130.     Defendants also tweeted the lie that Mr. Straka "got the feds to lower his felony charges to misdemeanor by snitching on basically everyone he knows. So now he's more rat than felon. Still a criminal."

131.     This is false; in fact, at Mr. Straka's sentencing hearing, the prosecution stated, "We don't have any information that he would even be able to be charged with a felony. He didn't go inside of the Capitol. We have no information at this time, we don't believe that he did anything other than what he did . . . but we don't have any reason to have charged him with a felony. So there wasn't any consideration, at least that I'm aware of, that Mr. Straka was ever able to be charged with a felony offense."

132. Defendants also falsely accused Mr. Straka of using "PPP loans and the #WalkAway PAC to "fund his attacks on the United States Capitol" and "his #insurrection." Besides the fact that Mr. Straka did not engage in either an attack on the U.S. Capitol or an "insurrection," the claims about PPP loans and improper use of PAC money are false.

133. Finally—for purposes of this very abbreviated summary—Defendants have consistently and cynically published false and defamatory claims relating to Mr. Straka's homosexuality, notwithstanding their posture as would-be champions of progressive values, including tweets by @highenanontoo that:

- o Mr. Straka's "gay experience was clearly glory holes and cocaine whenever possible"; which is false; and

- o "Brandon sure seems to spend time lurking around little boys Twitter pages"; which is false.

134. Similarly, defendant @BrawndoSnitchka tweeted, "Does the evidence suggest I [Brandon Straka] am actually FOR groomers? Okay yes but is my [Brandon Straka's] HAIRLINE receding? Also yes."

**f)      *Targeting Work Colleagues and Other Associates***

135. In addition to the public at large, part of Defendants' reputation-destruction program is to reach out to Mr. Straka's colleagues and business associates and defame Mr. Straka, create suspicion and erode trust within the conservative movement—and, in particular, to deprive him of speaking opportunities and media appearances.

136. The quantity of Mr. Straka's colleagues in the conservative movement contacted by Defendants is not yet known, but they number at least in the dozens, and include the following highly-influential individuals and organizations:

- o Candace Owens

27

- o   Carl Higbe.

- o   Charlie Kirk

- o   Conservative Political Action Conference (CPAC)

- o   Donald Trump Jr.

- o   Eric Trump

- o   Fox News

- o   James O'Keefe

- o   Kari Lake

- o   Lara Logan

- o   Lara Trump

- o   Matt Schlapp

- o   Newsmax

- o   Ron DeSantis

- o   Ric Grennell

- o   Tucker Carlson

- o   Vivek Ramaswamy

137.    On information and belief, Defendants have repeated the false statements and spurious accusations above in order to poison Mr. Straka's name and reputation with virtually every high-profile person in the world of conservative politics.

138.    Defendants have also begun a practice of harassing hosts of cable news shows that Mr. Straka is invited onto as a commentator.

28

139.     For example, last summer Mr. Straka was booked as a guest on "Frontline" with Carl Higbe, a national prime time cable TV news show, and Mr. Straka posted a tweet to promote his appearance on the show.

140.     Within 22 minutes, Defendants had tweeted a string of grossly malignant comments, including, *inter alia*, a tweet by Defendant @BrawndoSnitchka that Higbe looked like "a megachurch pastor convicted of many, many rapes in a Lifetime Original Movie" and a tweet by Defendant @highenanontoo implying that Mr. Straka himself is a rapist.

141.     Defendants also monitor Twitter for notices of events or fundraising dinners at which Mr. Straka had been invited to speak, and routinely utilize the same techniques and publish the same false and defamatory claims about Mr. Straka in an effort to get Mr. Straka's speaking engagements cancelled.

142.     In 2023 alone, Defendants have engaged in increasingly obsessive, gut-wrenching efforts to further injure Mr. Straka's business and reputation.

143.     Indeed, after Mr. Straka took to Twitter to announce his vindication by way of the dismissal of a civil lawsuit against him in connection with January 6th, Defendants immediately began spreading lies and misinformation about the lawsuit, which was dismissed in its entirety.

144.     In a matter of days, Defendants contacted countless numbers of Mr. Straka's followers, publishing hundreds of tweets which claimed falsely that

   o   Mr. Straka was lying about winning the case,

   o   that the litigation against him was still "ongoing," and

   o   that the judge in the case "encouraged the plaintiffs to continue the case against Straka" because "the evidence against him is so overwhelming".

145. Defendants also claimed that Mr. Straka was lying to his followers and donors about his success in the litigation to swindle money from them.

146. Defendants then used this new opportunity to once again republish their most-repeated defamatory statements about Mr. Straka to his followers—that he is a violent felon who instructed and cheered on violence against police officers, encouraged rioters to attack the Capitol, confessed to felony charges, "snitched" to the FBI and turned over information on his followers, donors, and business associates—hundreds more times to capitalize on the news of his court victory.

147. Clement, @BrawndoSnitchka, @ChiChiVision18Vision18, @toolejk and @highenanontoo collectively stalk and harass Mr. Straka, Mr. Straka's donors, supporters and vendors multiple times literally every day.

148. Defendants maliciously attack every aspect of Mr. Straka's business and character.

149. Defendants engage in both cyberstalking and cyberstalking by proxy, i.e., posting electronic messages about Mr. Straka that lead other individuals to have unconsented and harassing contact with Mr. Straka.

150. This conduct extends to Plaintiffs' own social media app, #WalkAway Social, which Mr. Straka regularly promotes on Twitter. Plaintiffs have documented hundreds of instances in which, after searching Twitter for comments from people who enjoy using this app, Defendants have contacted these users and falsely claimed that Mr. Straka is an FBI informant who is collecting their personal information to turn over to the FBI.

151. There is literally nothing that Mr. Straka can say or do that Defendants will not immediately attack—whether it is the announcement of speaking engagement, media appearance,

30

business venture, occurrence in his personal life or his family's life—with a swarm of vitriolic perversely hateful messages about Mr. Straka on Twitter.

152. Indeed, on Christmas Day of 2023, when most people are enjoying time with their families and loved ones, Defendants launched yet another online assault on Mr. Straka and #WalkAway.

153. Over the course of Christmas, Defendants @DaClementMusic and @BrawndoSnitchka posted about Straka and #WalkAway over a hundred times, repeating their false and defamatory claims that Mr. Straka is a felon, a white nationalist, a Qanon cultist, a grifter, a convict, an FBI informant, a "creepy weirdo gay", an employer of Holocaust deniers, and a violent anarchist who recruited people to commit violence on January 6th.

154. Defendants also repeated and republished their false claims that Mr. Straka was lying to his audience and supporters about prevailing in his civil case, that the litigation is ongoing, and that Mr. Straka would say or do anything to prevent a jury from seeing the overwhelming evidence against him in this civil case.

155. In fact, all the claims against Mr. Straka were dismissed. Defendants knew this, but selectively cropped statements from civil case documents and published them to appear to give corroboration for their lies, repeating them dozens of times in one day alone.

156. Also on Christmas Day of 2023, Defendants began posting #WalkAway's most recent 990 IRS filings, as well as publishing the names of investment firms that #WalkAway's donors have used to donate to the organization as well as the names of the organizations' directors, tagging the investment firms that employed these directors in their posts and making the false and asserting that

- o "#WalkAway provided ZERO services," which is false and defamatory;

o Mr. Straka has used the #WalkAway org for "personal inurement," which is false and defamatory;

o #WalkAway is funneling and diverting money to other causes and bank accounts, which is false and defamatory;

and baselessly threatening that "penalties would be levied against each board member individually."

157. Of the tens of thousands of comments Defendants have made about Straka on a daily basis over the past three years, virtually every one reiterates Defendants' false and defamatory claims that Mr. Straka is a violent, psychotic, sociopathic, criminally-natured, malignant narcissist, thief, con-artist, grifter, liar, and more.

158. The extent of Defendants' defamation of Mr. Straka is so vast that setting forth each of the over 30,000 instances of defamation by Defenants in the body of this Complaint would be impractical. For this reason, a list of defamatory tweets collected in 2023 alone is set forth as Exhibit A hereto and incorporated herein as if fully set forth.

## COUNT I
### Tortious Interference

159. Plaintiffs restate the foregoing paragraphs of this Complaint and incorporate them herein by reference.

160. Plaintiffs had valid contracts and reasonable business expectations in and to his relationships with donors, vendors, speaking engagements and event organizers.

161. From their research and review of available information on the Internet and social media, which is evident from Defendants' own tweets, replies and other social media activity, Defendants each knew about these contracts and expectations.

162.    Defendants intentionally interfered with Plaintiffs' contracts and prospective business expectations by contacting Plaintiffs' donors, vendors, event organizers and cable news hosts and taking action to induce them to terminate their relationships with Plaintiffs.

163.    Defendants employed improper methods of interference, including actions and practices that were defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and not justified by prevailing standards of conduct in the commercial environment.

164.    Defendants' concerted tortious conduct continues unabated and, indeed, continues to escalate.

165.    Defendants' social media activity evinces a disturbing, concerted effort to terrorize Mr. Straka through a multitude of attacks on his business and reputation.

166.    As a direct result of Defendants' intentional and tortious interference, Plaintiffs have suffered and, unless such conduct is enjoined by this Court, will continue to suffer special damages, presumed damages and actual damages, including, but not limited to, loss of income and injury to their business, injury to their reputation, costs and other out-of-pocket expenses, in an amount to be determined at trial.

167.    Plaintiffs have been willfully, intentionally and incessantly harassed by Defendants.

168.    Multiple times every day of 2023 and for years before that, Defendants engaged in a knowing and willful course of conduct directed at Plaintiffs which seriously threatens and intimidates Mr. Straka and others involved with Plaintiffs, and which serves no legitimate purpose.

169.    Acting in concert, Defendants disseminate false and defamatory statements daily that cause irreparable harm to Plaintiffs.

170.    Plaintiffs are unable to repair their reputations with the millions of unknown Twitter users whom Defendants contacted and to whom they have published their false and defamatory statements unilaterally.

171.    Defendants' pattern of conduct, using social media to tag and attack Plaintiffs as well as their donors and supporters, vendors and event venues, consists and is composed of a series of acts over a period of time, evidencing a continuity of purpose, including a series of acts of stalking Mr. Straka, contacting Mr. Straka, or otherwise communicating with him via Twitter.

172.    Defendants know or reasonably should know that their conduct has harmed and is likely to cause harm to the physical health, safety or property of Mr. Straka as well as a serious threat to his employment, business or career as well as his social relationships.

173.    Defendants know or reasonably should know that their conduct has harmed and is likely to cause serious harm to the income of all the Plaintiffs.

174.    Defendants have been clearly informed to cease their conduct but refuse to do so.

175.    Plaintiffs have no adequate remedy at law.

## COUNT II
### Defamation

176.    Plaintiffs restate the foregoing paragraphs of this Complaint and incorporate them herein by reference.

177.    As alleged above, Defendants made, published and republished numerous materially false factual statements of or concerning Plaintiffs.

178.    Defendants' false and defamatory statements about Plaintiffs include the following:

    A. On September 21, 2022, Defendant @zibtara posted on X about Mr. Straka, "He hasn't. He gave up other Jan 6 defendants and is currently fighting to keep that classified. Google it. I dare you. He's not one of you; he makes money off of you."

34

Despite diligent efforts to learn about the defamatory statements Defendants were posting about them, Plaintiffs did not discover this post by @zibtara until late 2023.

B. On October 31, 2022, Defendant @zibtara posted on X, "@brandonstraka, remember when you stood up for a guy that kicked a dog down the stairs? That dog died. Are you still advocating for people that murder dogs?" Despite diligent efforts to learn about the defamatory statements Defendants were posting about them, Plaintiffs did not discover this post by @zibtara until late 2023.

C. On or about January 24, 2023, Defendant @MikeClover7 posted on X, "Reminder that convicted insurrectionist Brandon Straka uses @MetroPayTech to fund organized political violence."

D. On or about February 4, 2023, Defendant Clement posted the following on X in response to a post about Mr. Straka: "Is that the one where he says that gay people always made him uncomfortable at parties to the point of paranoia but forgets to mention that he's a coke addict?"

E. On or about February 5, 2023, Defendant @BrawndoSnitchka posted on X about Mr. Straka, "Not surprising. He was up all night attacking people's looks and making fun of them for going to community college. Makes you wonder what he says about average #WalkAway donors behind their backs while he spends their money on cosmetic procedures."

F. On or about February 17, 2023, Defendant Clement posted on X about Mr. Straka, "A January 6 felon convict (who informed his way out of prison time) is in NYC. Keep your eyes peeled for a domestic terrorist."

35

G.  On or about March 16, 2023, Defendant Clement posted on X, "Yes! Brandon Straka handed over details about his followers and funders to the fbi as part of his plea deal to avoid prison time for the crimes he filmed himself commit. Now he's found a way to gather more info from his followers! So great!"

H.  On or about March 20, 2023, Defendant Clement posted on X, "Brandon Straka literally filmed himself commit federal crimes and a felony in a restricted area during a violent riot. Injured cops are suing him for his confessed role in violence, that matches his video. He's lucky his Trump-appointed judge let him snitch to avoid prison."

I.  On or about March 22, 2023, in response to the post quoted above, Defendant Clement posted on X, "Your talking points are the usual, but do you know that crimes happen outside building, right? Brandon Straka filmed himself commit a felony outside the building. It's a fact, unless you think he snitched for fun?"

J.  On or about March 22, 2023, Defendant Clement posted on X, "Nope, it's just the facts ma'am. But you're scared of them. Brandon Straka and your heroes were demonstrating with Gavin Crowl the child molester on #J6, BS knew him well enough to inform on him to the fbi, along with BS's other friends."

K.  On or about April 22, 2023, Defendant @higheanontoo posted on X about Mr. Straka, "Brandon sure seems to spend time lurking around little boys Twitter pages. Odd af…"

L.  On or about May 25, 2023, Defendant Clement posted on X, "Brandon Straka was struggling waiter/actor/hairstylist turning 40 and sick of hustling til Alex Jones

gave him money to start a completely fake 'movement.' No thinking person believes that recitation of talking points that is his origin story."

M. On or about May 25, 2023, Defendant Clement posted on X, "Brandon Straka was hired by Alex Jones to speak against LGBTQ people so maga bigots can pretend they have an ally."

N. On May 27, 2023, Defendant Dew posted on X, "And walk away hasn't caused anyone to switch. I like to ask his supporters when they last voted Democrat. They either never did or switched well before Brandon's grift started. But he's going to stay on the grift until the wheels fall off. [shrugging emoji]."

O. On June 17, 2023, Defendant Dew posted on X about Mr. Straka, "Even when he was doing hair, he worked for a 'glam squad' that just styles the hair before an event. Not even allowed near the [scissors emoji]."

P. On June 17, 2023, Defendant Dew posted on X about Mr. Straka, "I haven't spoke to him since 2017 when he started walk away. He blocked me on Twitter for mentioning one of his DWI arrests when he was trying to deny them. [shrugging emoji]."

Q. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein,[1] Defendant Clement posted on X, "[laughing emoji] 'positive' (run by one of the meanest convict grifters known to Twitter) 'community' a bunch of anonymous accounts who bond over the fact that Brandon

---

[1] Around the time he was served with the original Complaint, Defendant Clement hid his X account from public view, thereby preventing Plaintiffs from stating the precise date of certain posts he made on X.

Straka is a gay man who gets paid to spread disgusting and violence inciting lies about LGBTQ people)."

R. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein, Defendant Clement posted on X, "We have no idea how much Brandon Straka had to pay to settle with the injured cops. All we have is his very inconsistent and suspect story. It's not like he's a proven liar [winking emoji] who snitched on friends to avoid prison and hires holocaust deniers to pretend they used to be Dems."

S. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein, Defendant Clement posted on X, "[laughing emoji] so no, you have nothing but a cute blog that only cites a proven liar, grifter, convict. Cool story brad. [laughing emoji] do you still believe there was a terrorist attack in Niagara Falls? Or these holocaust deniers who Brandon Straka hired to pretend they used to be Democrats? [shrugging emoji]."

T. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein, Defendant Clement posted on X, "When you say 'he,' you're citing Brandon Straka, the unrepentant convict and proven liary who spread the fake terror attack in Nagara falls lie, the Qanon election lies, and keeps getting caught faking his walkaway videos, like these holocaust deniers he hired 2B former Dems?"

U. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein, Defendant @higheanontoo posted on X,

38

"WalkAway is full of all sorts of sexual predators, how are you just relaxing [sic] this [laughing emoji]?"

V. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein, Defendant @higheanontoo posted on X, "What a crock of shit. #WalkAway operates in Texas and commits non profit fraud annually with no oversight. Partisan enforcement."

W. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein, Defendant Clement posted on X about Mr. Straka, "[laughing emojis] Alex Jones gave him the start up money. It's only ever been about getting money out of elderly maga by repeating their lies back to them."

X. On an unknown date that upon information and belief occurred within one year of the original Complaint filed herein, Defendant Clement posted on X, "No, technology was the source of the very real fact that walkaway was a fake org that Russian bots, and others for hire, helped prop up like it was a real thing and not just a slushfund for a convict turned fbi-informant."

Y. On an unknown date that upon information and belief occurred within one year of the original complaint filed herein, Defendant Clement posted on X, "What kind of empathy do you have for lying grifter's who promote and incite violence then lie about everyone who catches them in their lies? Brandon Straka's body count is impressive but doesn't inspire empathy." In the same X thread, Defendant Clement wrote, "It's definitely the only logical conclusion based on the evidence. Brandon Straka is responsible for a lot of death."

179. Defendants published these false statements without privilege of any kind.

180.    Defendants' false statements were not a fair or accurate report of the record, or any part thereof, in Mr. Straka's criminal case.

181.    Defendants' statements about Mr. Straka constitute defamation *per se* because they accuse and impute to Mr. Straka (a) one or more crimes, including insurrection, and (b) an unfitness to perform the duties of an office or employment for profit, including lack of ethics, lack of integrity, lack of veracity, lying, cheating and stealing.

182.    Defendants' statements also prejudice Mr. Straka in his profession and employment as a journalist, business owner and political commentator as well as his status as a licensed cosmetologist.

183.    By tweeting the statements, publishing them on their misleading WalkAwayPac.com website and otherwise transmitting them to third parties, Defendants knew or should have known that the statements would be republished repeatedly to Plaintiffs' detriment because such republication was the natural and probable consequence of Defendants' actions.

184.    In addition to their original publications, Defendants are liable for the millions of third-party republications of the false and defamatory statements under the republication rule.

185.    Defendants' false and defamatory statements harmed Plaintiffs and their reputations, causing special damage, including loss of donors and supporters, presumed damages and actual damages.

186.    Defendants published their defamatory statements with actual knowledge that the statements were false or with reckless disregard for whether they were false. Defendants devote inordinate amounts of time to tracking Mr. Straka's every move and monitoring almost every publicly available piece of information about Plaintiffs that appears online. Accordingly, Defendants are intimately familiar with the public record regarding Plaintiffs. Thus, when

40

Defendants made false and defamatory statements about Plaintiffs, including accusing Mr. Straka of "g[iving] up other Jan 6 defendants and is currently fighting to keep that classified," of "advocating for people that murder dogs," of "fund[ing] organized political violence," of being a "coke addict," of having "spen[t] [#Walkaway donors'] money on cosmetic procedures," of being a "felony convict," of providing the GBI with "details about his followers and funders . . . to avoid prison time," of having "filmed himself commit federal crimes and a felony," of having "filmed himself commit a felony," of having demonstrated with a child molester on January 6, of "spend[ing] time lurking around little boys Twitter pages," "gets paid to spread disgusting and violence inciting lies about LGBTQ people", of "hir[ing] holocaust deniers to pretend they used to be Dems," of receiving his "start up money" from and having been hired by Alex Jones to create a fake movement and "speak against LGBTQ people," of not being allowed to cut hair while working as a hair stylist, of having multiple DWI arrests, and of having a "body count" and being "responsible for a lot of death," and stating that #Walkaway is "full of all sorts of sexual predators," commits "non profit fraud annually," is a "slushfund for a convict turned fbi-informant," and has not caused any Democrats to leave the party (i.e., #Walkaway's core mission). Defendants knew these statements were false because they had no support in the vast trove of online information about Plaintiffs, and, in many cases, were controverted by online sources with which Defendants were familiar.  Defendant Dew in particular was aware of the falsity of her statements about Mr. Straka given her familiarity with him going back many years.

187.    Specifically, prior to publication, Defendants reviewed the public record in Mr. Straka's criminal case.  Defendants knew, therefore, that their subsequent statements regarding that case were false.

41

188. Defendants had no source for these and their other defamatory statements. Rather, Defendants fabricated the statements, including their claims that Mr. Straka was "convicted" of "insurrection," that he was a "felon", that he "admired Hitler," and so forth, as alleged herein.

189. Defendants' conduct was undertaken pursuant to a preconceived agenda meant to harm Mr. Straka.

190. Defendants harbored hostility, hatred, extreme bias, spite and ill will towards Mr. Straka.

191. As a result of their accumulated motive and bias, Defendants published intentionally false statements about Plaintiffs.

192. As demonstrated by the words chosen, the timing and tenor and of their posts and the sheer volume of their publications, Defendants intended to inflict harm through knowing or reckless falsehoods about Plaintiffs.

193. Defendants intentionally abandoned any integrity in publishing and republishing these statements. They did not seek the truth or report it. Rather, they betrayed the truth for the sake of their motive and bias against Plaintiffs.

194. Rather than minimize harm, Defendants set out to inflict maximum pain and suffering on Plaintiffs to harm their reputation and impair the #WalkAway Campaign.

195. Defendants broadcast and published the statements in the broadest manner possible, to Internet and vast social media audiences, for the sole purpose of injuring Plaintiffs's reputation and interfering with their business.

196. As a direct result of Defendants' defamatory conduct, Plaintiffs have suffered and, unless such conduct is enjoined by this Court, will continue to suffer special damages, presumed damages and actual damages, including, but not limited to, loss of income and injury to their

42

business, injury to their reputation, costs and other out-of-pocket expenses, in an amount to be determined at trial.

197.    Plaintiffs have no adequate remedy at law.

## COUNT III
## Trademark Infringement | 15 U.S.C. § 1114

198.    Plaintiffs restate the foregoing paragraphs of this Complaint and incorporate them herein by reference.

199.    #WALKAWAY is a registered trademark of WalkAway Campaign LLC, a New York Limited Liability Company, U.S. Reg. No. 5,868,605, which trademark has been duly licensed to Plaintiffs for use in connection with their activities in connection with the #Walkaway Campaign.

200.    Based on Plaintiff's extensive advertising and promotion of the #WalkAway Campaign under the #WALKAWAY trademark, the #WALKAWAY name and trademark have acquired a secondary meaning so that any service and advertisement bearing such trademark immediately associated by purchasers and the public as being a service or affiliate of Plaintiffs or being authorized by them.

201.    Notwithstanding any expressive purpose Defendants may have had or have in creating and maintaining their website, their appropriation of Plaintiffs' marks to spread their message by confusing Internet users into thinking that they are entering a website created, maintained or endorsed by Plaintiffs.

202.    Consumers are also confused because the domain name of Defendants' WalkAwayPac.com site suggests that Plaintiffs are the source or approve of Defendants' website and does not suggest or hint at criticism, comment or reporting.

43

203. Plaintiffs' actual website is WalkAwayPAC.org, so the name of Defendants' sham website is clearly intended to lure and confuse members of the public who enter the wrong domain name and access Defendants' sham website when trying to access Plaintiffs' real website.

204. Defendants' use of the #WALKAWAY name and trademark in connection with their creation, publication and maintenance of the website at the domain www.WalkAwayPac.com constitute use in commerce.

205. Defendants' activities create the false and misleading impression that their website is operated by or authorized by Plaintiffs.

206. Defendants engaged in these infringing activities with the intent to confuse and deceive the public.

207. Defendants' creation and operation of the www.WalkAwayPac.com website is likely to cause confusion and mistake in the minds of the public and, in particular, tends to and does falsely create the impression that the content published on that website is published, authorized or approved by Plaintiffs when, in fact, it is not.

208. Defendants' conduct as alleged herein has resulted in and continues to result in initial interest confusion.

209. Defendants' unauthorized use of the #WALKAWAY trademark has resulted in Defendants unfairly benefitting from Plaintiff's advertising, promotion and goodwill and profiting from its unauthorized and deceptive use, to the substantial and irreparable injury of the public, of Plaintiffs and the #WALKAWAY trademark and its goodwill.

210. Defendants' acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

211. Plaintiffs have no adequate remedy at law.

## COUNT IV
### False Designation of Origin and Unfair Competition | 15 U.S.C. § 1125(a)

212. Plaintiffs restate the foregoing paragraphs of this Complaint and incorporate them herein by reference.

213. In connection with their activities, Defendants have affixed, applied and used false designations of origin and false and misleading descriptions and representations, including the #WALKAWAY name and trademark, to their own offerings, which tend falsely to describe the origin, sponsorship, association or approval by Plaintiffs of the defendants' Internet content.

214. Defendants have used the #WALKAWAY trademark with full knowledge of the falsity of their false designations of origin, descriptions and representations, particularly in connection with the www.WalkAwayPac.com website operated by them, all to the detriment of Plaintiffs.

215. Defendants' use of the #WALKAWAY trademark on their infringing website and in association with defendants' services constitutes false descriptions and representations tending falsely to describe or represent Defendants and Defendants' offerings as being authorized, sponsored by or affiliated or associated with Plaintiffs.

216. Defendants have used the #WALKAWAY trademark and the name and trademark of the #WalkAway PAC on its infringing website with the express intent to cause confusion and mistake, to deceive and mislead the public, to trade upon the reputation of Plaintiffs and to improperly appropriate to themselves the valuable trademark rights of Plaintiffs.

217. Defendants' acts constitute the use in commerce of false designations of origin and false or misleading descriptions or representations, tending to falsely or misleadingly describe or represent defendants' services as those of Plaintiffs in violation of Section 43(a) of the Lanham Act, 15 U.S.C.§1125(a).

45

218.	By reason of the foregoing, Defendants are liable to Plaintiffs for: (a) an amount representing three (3) times Plaintiffs's damage or defendants' illicit profits; and (b) reasonable attorney's fees, investigative fees and prejudgment interest pursuant to 15 U.S.C. § 1117.

219.	Plaintiffs have no adequate remedy at law.

**COUNT VI**
**False Designation of Origin and Unfair Competition | Nebraska Law**

220.	Plaintiffs restate the foregoing paragraphs of this Complaint and incorporate them herein by reference.

221.	The foregoing acts constitute knowing and willful trademark infringement, unfair competition and false designation of origin under the laws of the State of Nebraska.

222.	Plaintiffs have been damaged by Defendants' wrongful acts in an amount to be determined at trial.

223.	Plaintiffs have no adequate remedy at law.

**COUNT VII**
**Civil Conspiracy / Contributory Infringement**

224.	Plaintiffs restate the foregoing paragraphs of this Complaint and incorporate them herein by reference.

225.	Beginning in 2020 and continuing through the present, Defendants combined, associated, agreed or acted in concert together for the express purpose and illegal objective of injuring Plaintiffs and intentionally interfering with and destroying their business and reputation.

226.	In furtherance of the conspiracy and preconceived plan, Defendants work together and with others to go after Plaintiffs' vendors, donors, supporters and colleagues to destroy Plaintiffs' ability to conduct business.

227.    As alleged above, Defendants have undertaken a joint scheme the unlawful purpose of which included the publication and republication of false and defamatory statements to harm Plaintiffs' business and reputation and to infringe the #WALKAWAY trademark and wrongfully cause consumer confusion regarding the origin, sponsorship or affiliation of their www.WalkAwayPac.com website.

228.    Upon information and belief, Defendants exchanged documents and communications to work jointly on their fraudulent narratives about Plaintiffs and to further their infringing conduct.

229.    Defendants methodically retweeted each other's tweets and worked together to target Plaintiffs' supporters, donors and vendors in an all-out assault on Plaintiffs.

230.    Defendants' actions and their publications and republications and their infringing creation and use of the www.WalkAwayPac.com website were overt acts in furtherance of the conspiracy.

231.    Defendants and their co-conspirators acted intentionally, purposefully, without lawful justification, and with the knowledge that they were defaming Plaintiffs and interfering with their business by these acts

232.    Defendants' actions constitute a conspiracy at common law.

233.    Defendants actions also constitute contributory trademark infringement, unfair competition and false designation of origin.

234.    As a direct result of Defendants' unlawful conduct, Defendants have suffered and, unless such conduct is enjoined by this Court, will continue to suffer special damages, presumed damages and actual damages, including, but not limited to, loss of income and injury to his

business, injury to their reputations, costs and other out-of-pocket expenses, in an amount to be determined at trial.

235.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter Judgment against Defendants, jointly and severally, as follows:

1. Preliminary and permanent injunctive relief;

2. Compensatory damages;

3. Punitive damages;

4. Prejudgment interest at the maximum rate allowed by law;

5. Post-judgment interest at the maximum rate allowed by law;

6. Costs and other recoverable amounts as allowed by law;

7. Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all matters amenable thereto by law.

DHILLON LAW GROUP, INC.
A CALIFORNIA PROFESSIONAL CORPORATION

By: /s/ Ronald D. Coleman
 Ronald D. Coleman

(admitted *pro hac vice*)
50 Park Place, Suite 1105
Newark, NJ 07102
973-498-1723
rcoleman@dhillonlaw.com

Jesse D. Franklin-Murdock (admitted *pro hac vice*)
177 Post Street, Suite 700
San Francisco, CA 94108

48

415-433-1700
jfranklin-murdock@dhillonlaw.com

MCGINN LAW FIRM
20 North 16th Street
Council Bluffs, IA 51501
712-328-1566
bmcginn@mcginnlawfirm.com

*Attorneys for Plaintiffs*

Dated: April 8, 2024